HAROLD L. BRAZILE and LINDA A. BRAZILE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Brazile v. Commissioner
Docket No. 14306-80
United States Tax Court
T.C. Memo 1983-105; 1983 Tax Ct. Memo LEXIS 684; 45 T.C.M. (CCH) 795; T.C.M. (RIA) 83105; February 17, 1983. Robert D. Forrester,Wendell L. Davies,Harold C. Rector and Stephen W. Spencer, for the petitioners. William P. Hardeman, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' *685 income tax for the calendar years 1970, 1971 and 1972 in the amounts of $20,864, $1,932.83 and $39,191, respectively, and additions to tax under section 6653(b) [1] in the respective amounts of $10,432, $966.42 and $19,596. [2] The issues for decision are (1) whether assessment or collection of the deficiencies determined by respondent is barred by the statute of limitations; [3] and (2) if respondent establishes that the return for each of the years 1970, 1971 and 1972 is false and fraudulent with intent to evade tax, what is the proper additional income subject to tax in each of the years here in issue, and are petitioners liable in each year for the addition to tax for fraud under section 6653(b). *686 FINDINGS OF FACT Petitioners are husband and wife who resided in Amarillo, Texas, at the date of the filing of their petition in this case. They filed a timely joint U.S. Individual Income Tax Return, Form 1040, for each of the calendar years 1970, 1971 and 1972 with the Internal Revenue Service Center at Austin, Texas. Prior to 1964, Harold L. Brazile (petitioner) had been employed for a number of years in various grocery stores and in the years immediately preceding 1964 had been employed as a butcher. Petitioner Linda A. Brazile never worked outside her home until 1964 when petitioner opened his own meat market and she worked there on a part-time basis. Petitioner was born in 1939 in Nashville, Arkansas, which is a rural community of approximately 2,500 people. He is the younger of two children. Petitioner was brought up on a farm and began working for his father on the farm at a very young age. As soon as he was old enough, he began working for other people around Nashville, Arkansas, and would earn a little money. He entered public school in 1946, but worked after school and on weekends. When petitioner was growing up, his grandparents lived on the farm with petitioner *687 and his parents. When petitioner was approximately 12 years old, his family moved to Amarillo, Texas, and he began working, delivering newspapers and helping after school at a local grocery store. When he was 15, he moved back to Arkansas and lived for a few months with his sister and then returned to Amarillo. When he was in Arkansas, he worked for a grocery store. When he returned to Amarillo, he went back to work in a grocery store after school. He was in the ninth grade in school and was making very poor grades. Because of the failing grades he was making in school, he dropped out of school in the tenth grade and began working full-time. In 1957, when he was only 17, petitioner married his wife, Linda, who was also 17. At that time, Mrs. Brazile had completed the eleventh grade in high school. Petitioner continued working for various grocery stores in Amarillo. He later worked in a grocery store in DeQueen, Arkansas, and then returned to Amarillo to work in a gorcery store. Before he left Amarillo, petitioner had become a butcher and after returning to Amarillo from Arkansas, was the manager of the meat department of the store. In 1964, petitioner opened his own meat *688 market. From the time petitioner first began working, he would take some of the money he earned and put it away at home and keep it in cash. His grandparents had an unfortunate experience with loss of money in a bank closing in 1930 and encouraged petitioner's parents and petitioner to save cash at home. By 1964, when petitioner opened the meat market in Amarillo, Texas, he had, in cash at home, between $14,000 and $15,000. Petitioner leased the building in which he opened his meat market and purchased his equipment on time so that he used only about $4,000 of the cash he had at home in the opening of his market. Soon after petitioner opened his meat market in Amarillo, Texas, he was approached by Charles McClure, who was working for a bookkeeping firm. Mr. McClure talked with petitioners about installing a bookkeeping system for them. He represented to petitioners that the firm by which he was employed would install a bookkeeping system for their specific business and would provide them with complete bookkeeping, tax and business management services.Mr. McClure had only completed high school and had gone to work for the bookkeeping company as a salesman. The instructions *689 which Mr. McClure gave to petitioners as to what they should give him from which to keep their books was that each day they should read the total amount of sales that had been rung up on the cash register in their store and enter it on a sheet furnished to them by Mr. McClure. Mr. McClure gave them a folder and told them that they should place all invoices which had been paid into the folder and, when a payment was made in cash, a memorandum should be placed in the folder of the cash payment if there was not an invoice for the payment. Shortly after opening the meat market, petitioner employed one full-time employee and two high school boys who worked for him in the afternoon. The employees were paid in cash and petitioner made the notation of the payroll cash payment and placed it in the folder for Mr. McClure. Twice a month Mr. McClure or someone he sent would pick up the sheet showing the cash register reading and the folder with the invoices and memoranda of cash payments and take them to the bookkeeping office where someone would make a summary of the information. In 1968, Mr. McClure left the bookkeeping firm for which he was working and opened West Texas Bookkeeping *690 Service for himself. He took petitioner's account with him. Thereafter, he had petitioner follow the same system for recording the reading from the cash register and placing of invoices or memoranda of cash payments in a folder. Either Mr. McClure or one of his employees would prepare the summary from the information furnished to him by petitioner. Someone at the bookkeeping firm prior to 1968 and Mr. McClure or an employee of his thereafter would prepare petitioner's payroll tax reports as well as his Federal income tax returns from the information on the summary sheets. In 1966, petitioner opened a second store in Amarillo. Although petitioner owned this store, it was run by petitioner's mother and father and three or four employees. This store operated until late 1970. However, in approximately April 1970 it was moved from its original location to another location in Amarillo. Petitioner had never had a bank account of any type until he opened his meat market in Amarillo, Texas. In 1964, at the time he opened the meat market, petitioner opened a bank account at Amarillo National Bank, Amarillo, Texas. In April 1970, when the second store was moved, petitioner opened *691 a second account at Amarillo National Bank. Both of these accounts were checking accounts. Petitioner never maintained a savings account at any bank. Petitioner would go to work at about 5 o'clock in the morning and work until after 8 o'clock in the evening. When he had only one store, he would cut the meat and put it in the cases at that store and have it all prepared at the time the store opened to customers at 8 o'clock. When petitioner was operating the second store, he would go to the second store at 5 o'clock in the morning and cut the meat needed for the entire day at that store and put it in the cases, and then, at approximately 7 o'clock, go over to his original store and cut meat for that store to have available for sale. After the store closed at 8 o'clock, petitioner would read the figures shown on the cash register and enter the amount on the sheet furnished him by Mr. McClure in the space provided for that day's entry. He would then put the money and checks that had been received in a container and take them home for the evening instead of leaving them in the store. The following morning, he would bring the money and checks back to the store and Mrs. Brazile *692 would come down at about 10 o'clock and count the cash and list it and the checks, which very often were numerous, on a bank deposit slip and, before the bank closed, take the money and checks to the bank for deposit. Petitioner never counted the money and checks he received in a day to compare the total with the total sales shown on the cash register. Mrs. Brazile never checked the sales as shown from the cash register and recorded on the sheet furnished by Mr. McClure against the deposit she made at the bank. Although the majority of the expenses of the meat market were paid for by checks drawn primarily by Mrs. Brazile on petitioners' checking account, some purchases were paid for in cash. Purchases of bread and milk and miscellaneous items were usually the ones paid for in cash. When purchases were made in cash, petitioner or Mrs. Brazile would take cash from the cash register to make the payment and would write a notation on one of the slips furnished to them by Mr. McClure and place it in the folder furnished to them by Mr. McClure. Also, at times Mr. Brazile would instruct Mrs. Brazile to take a certain amount of cash out of the daily receipts and add it to the cash they *693 kept at home instead of depositing it in the bank. Generally this was done when Mr. Brazile believed the market had a very good day. Although most of petitioners' personal living expenses were paid by check, petitioners occasionally would take cash from the cash register for payment of these expenses. Soon after petitioners began operating their meat market, individuals would come in to purchase quarters or halves of beef. Petitioner had no charge system, but two different finance companies would finance purchases of the halves or quarters of beef for petitioner's customers. When a customer came in and ordered a half or a quarter of beef which was to be financed, Mrs. Brazile would fill out a contract form for the financing of the beef. When the beef had been delivered, she would take the financing contract to the finance company. The finance company would check it out and the next day would call Mrs. Brazile and tell her she could pick up the check for the beef. Mrs. Brazile would pick up the check and put it in her purse, and the next day, when she made her bank deposit, would deposit that check in the Amarillo National Bank. Mrs. Brazile did not ring the amount of the *694 checks she received from the finance company into the cash register. Since Mr. McClure had not told Mrs. Brazile to ring these amounts into the cash register, it did not occur to her to do so. The following schedule shows the total amounts, by year, received by petitioners from the finance companies in payment for beef quarters and halves that were financed: Year
Amount
1965
$4,399.32
1966
3,481.73
1967
3,328.99
1968
3,695.13
1969
7,438.72
1970
6,729.51
1971
5,276.74
1972
3,485.57
The following schedule shows the total amounts deposited by petitioners in their bank accounts at Amarillo National Bank for the years 1970, 1971 and 1972: 1970
1971
1972
Amarillo National Bank
(Original Account)
$259,880.44
$231,197.81
$310,302.88
Amarillo National Bank
(Account Opened in 1970)
154,761.93
50,000.00
Total
$414,642.37
$231,197.81
$360,302.88
Some of the amounts deposited were from loan proceeds and from property sales. The $50,000 deposit made to the account opened in 1970 was a cash deposit made in the fall of 1972. The lowest balance petitioners had in their bank accounts during each of the calendar years *695 1970, 1971 and 1972 was $28,265, $40,932, and $32,078, respectively. In the fall of 1972, a customer came into petitioner's store and stated that she was the executor of an estate that needed to sell a farm and receive cash proceeds from the sale. Petitioner and his wife discussed buying this 60-acre farm. At the time, they lived on a small farm that petitioner initially bought jointly with his father and later bought his father's interest. They counted the money they had in cash at home and it was almost $50,000. They took a small amount of cash from the cash register at the store to bring the total cash to $50,000 and deposited the $50,000 in the bank to use in payment for the farm. Approximately $3,000 of this cash deposit was in $100 bills and the remainder was in $20 bills and bills of smaller denominations. Respondent, using as the beginning point the bank deposits as above-stated, arrived at taxable income for petitioners of $53,913.69 for 1970, $16,007.29 for 1971, and $94,609.16 for 1972. Respondent failed to make an adjustment for a $2,000 loan petitioner received from his parents in 1970. He failed to deduct all business expenses paid by check in each of the *696 years here in issue, failed to make the proper adjustment for returned checks in each of the years here in issue, and failed to make the proper adjustment for personal cash expenditures in each of the years here in issue. For the year 1970, he failed to adjust for a refund petitioner received from a bakery organization to which he belonged and for cash used by petitioners to open the new bank account in 1970. Respondent failed to make proper adjustments for the itemized or standard deductions taken by petitioners in each of the years here in issue and failed to make proper capital gains deductions with respect to property sold by petitioners in 1970 and 1971. After making these adjustments, the taxable income computed by the method used by respondent is $29,914.34 for 1970, $3,297.58 for 1971, and $57,183.03 for 1972. The $57,183.03 includes the entire $50,000 cash deposited by petitioners in 1972 in their bank account at the Amarillo National Bank. Petitioners reported taxable income for 1970, 1971 and 1972 in the amounts of $3,656, $12,249 and $12,254, respectively. At the end of the year, Mr. McClure would take the information he had accumulated from the sales receipts *697 entered by petitioner from his cash register and the invoices placed into the folder he furnished them and prepare petitioners' income tax return. Before preparing this return, he would give petitioners a form on which to enter information with respect to their medical expenses and personal deductions. Mr. McClure also prepared a capital investment sheet on which he showed equipment purchased by petitioner that had a useful life of more than a year and the depreciation with respect thereto. After Mr. McClure prepared petitioners' income tax returns, he would bring them by and give them to petitioners, mark where they were to sign them and tell them to sign them and mail them to the Internal Revenue Service. Neither petitioner reviewed the return before signing it, but signed the return as prepared by Mr. McClure and mailed it in accordance with his instructions. There were some addition mistakes in the returns for each year here in issue and certain other mistakes in these returns. The most outstanding mistake was that the cost of goods sold for the year 1971 was understated by $10,000. Mr. McClure never asked for petitioners' bank statements or canceled checks and in no way *698 reconciled petitioners' bank accounts with the records he kept for petitioners or with petitioners' tax return. Petitioner Harold L. Brazile was indicted in a five count indictment in the Amarillo Division of the United States District Court for the Northern District of Texas on March 29, 1977. This indictment charged petitioner with willfully attempting to evade and defeat his income taxes for 1970 and 1972 in violation of section 7201. The indictment also charged petitioner with willfully making and subscribing income tax returns for 1970, 1971, and 1972 under penalties of perjury which he did not believe to be true and correct as to every material matter in violation of section 7206(1). Petitioner was found not guilty by a jury on all charges by order of acquittal dated June 15, 1977, in the Amarillo Division of the United States District Court for the Northern District of Texas. [4]
*699 Respondent in his notice of deficiency computed petitioners' income for each of the years here in issue on the basis of bank deposits adjusted for certain nontaxable items reduced by his determination of deductible expenses. Respondent determined that there was an underpayment of tax in each of the years here in issue, a portion of which was due to fraud with intent to evade tax. OPINION As both parties recognize, assessment and collection of the deficiencies for each of the years here in issue are barred by the statute of limitations absent proof by respondent that the return for that year was false or fraudulent with intent to evade tax. It is incumbent on respondent to prove fraud by clear and convincing evidence. . Although it is not necessary for respondent to prove the precise amount of underpayment, it is necessary that he show that there was some underpayment in each year and that a part of the underpayment is due to fraud. . In this case, respondent has failed to show any underpayment of tax by petitioners in the year 1971. For this *700 reason, any deficiency that might be due for 1971 is barred by the statute of limitations. In order to show that a return is false or fraudulent with intent to evade tax, respondent must show by clear and convincing evidence that there is some underpayment of tax for the year.
For the year 1972, respondent has failed to show that there is any deficiency in petitioners' tax unless a substantial amount of the $50,000 cash deposit made by petitioners in the fall of that year is considered to be income for the year 1972. Petitioners admit their failure to report $3,485.57 of receipts from beef sales which were financed in 1972, but there is no showing that this failure was due to fraud.The checks for this beef were deposited in petitioners' bank account and the evidence as a whole shows merely a misunderstanding by petitioners of the instructions from their bookkeeper as the explanation for their failure to include this amount on the sales sheet they supplied to Mr. McClure. Respondent's computation as corrected of $57,183.03 from the bank deposit method includes the $50,000 cash deposited in the fall of 1972 as well as the $3,485.57 of checks petitioners received for financed beef. *701 If the $50,000 cash deposit is deducted from the $57,183.03, the remaining $7,183.03 is less than the $12,254 taxable income reported by petitioners.The evidence shows that some amount, but only a relatively small amount of the $50,000 cash was accumulated from petitioners' 1972 receipts. The evidence also shows that some other amounts of cash used by petitioners for personal expenses were not deposited to petitioners' checking account. However, there is no evidence of the amount of personal expenses petitioners paid by cash except that the amount was small. Certainly, there is no clear and convincing evidence that the total of the cash accumulated by petitioners in 1972 and the cash that was used for personal expenses without being deposited totaled over $5,000. Not only did both petitioner and his parents testify as to petitioners' maintaining their savings which they accumulated over the years at home, the inference from the other evidence clearly is that the $50,000 cash was not for the most part from 1972 earnings. To accept the conclusion that the entire $50,000 was accumulated in 1972 would mean that petitioner's sales increased by $129,000 in 1972 over 1971, with total *702 costs increasing only about $33,000. The evidence shows that petitioner's operations in 1971 and 1972 were approximately the same and clearly indicates that any such substantial increase in profit percentage did not occur. Also, clearly petitioners had some savings. They had money with which to open their store in 1964 and with which to buy a farm with petitioner's father during the 1960's. They never had a savings account, and until they opened the meat market in 1964 had no form of bank account.The evidence as a whole clearly indicates that petitioners saved cash at home through the years. The evidence clearly shows an underreporting of income by petitioners in 1970, which is not totally explained by the $6,729.51 in receipts from financed beef. From an analysis of the bank deposits, it appears that the underreporting in 1970 was approximately $19,000.Also, if, as we have concluded, the $50,000 cash deposited by petitioners in 1972 was accumulated over the years from 1964 through 1972, some amount of this cash was probably accumulated in 1970 and not deposited to petitioners' checking account. Therefore, the issue as to 1970 is whether respondent has shown by clear and convincing *703 evidence that some part of the underpayment of tax resulting from the underreporting of income was due to fraud with intent to evade tax. Based on the evidence as a whole, we conclude he has not. In 1970, petitioner was operating two stores. One of these was managed by petitioner's parents. Petitioner testified in detail about his instructions to everyone who worked in the meat market to ring up all sales on the cash register and that he thought all sales were being rung up. However, even though both of petitioner's parents testified at the criminal trial and their testimony is stipulated into this record, and petitioner's father testified at the trial of this case, they were not questioned on the details of how the receipts at the store they operated were rung up on the cash register. In fact, the record is not clear as to when petitioner obtained the figures from this cash register to put on the sheet kept to be given to Mr. McClure. There was a separate bank account used in 1970 for receipts from the second store. Deposite to this account were $154,761.93 in 1970. Although the record is not clear, the indication is that Mrs. Brazile made these deposits and that petitioner *704 had picked up the funds for her to deposit. For all this record shows, any amounts which failed to be rung into the cash register in 1970 could have been at the second store so that petitioner would have no way of having direct knowledge of any failure to ring up some receipts in that store. Respondent has the burden of proof of fraud. The imprecise evidence in this case falls far short of the clear and convincing evidence needed to show fraud for the year 1970. Respondent relies heavily on a computation which shows that petitioners' expenditures for the period 1964 through 1969 exceeded their reported income plus established sources of nontaxable receipts. During most of these years, petitioner was operating the second store. While respondent's computation does indicate that petitioners' income during some or all of the years 1964 through 1969 was underreported, it does not show any knowledge of this fact on the part of petitioners. Also, during the years 1966 through 1969, the second store was being operated and may well have been the source of the unreported income without petitioners' having any knowledge of the underreporting. The indication from the record is that most *705 of the receipts from the second store were deposited in petitioner's bank account, even though they may not have been included in his reported income because of failure of his employees to properly ring all receipts into the cash register. Furthermore, there are no indications of fraud other than any inference that might be drawn from petitioner's understatement of income. Most of the receipts from petitioner's business were deposited in bank accounts, even though these bank accounts could not be reconciled with the records Mr. McClure was keeping of petitioner's business. Someone knowingly, fraudulently omitting income from his return would make more of an attempt to hide the omission than to make deposits to a bank account which would not reconcile with his other records. Also, when the agents began investigating petitioner's records, he supplied them with all the information he had and assisted them in analyzing the information. Respondent makes much of the fact that when two special agents first questioned petitioner, without prior notice to him of the fact that his returns were being investigated, he told them that he had deposited $60,000 cash in late 1972 which he got *706 from his father. Right after his interview with the agents, he consulted a lawyer, and early the next morning that lawyer, in petitioner's presence, called the two special agents and told them that the amount of cash petitioner had deposited was $50,000 and that it was cash he had been accumulating over the years. We are not persuaded that the fact that petitioner incorrectly stated the amount of cash deposited and its source to the agents when first questioned by them without notice is clear and convincing evidence of fraud, particularly when, within less than 24 hours, petitioner corrected the statement. Certainly, this record shows negligence on the part of petitioner. He should have discussed in more detail with Mr. McClure the nature of his business and questioned the system of bookkeeping Mr. McClure set up for him. Certainly, it was negligent of petitioner not to count each day's receipts to compare with the cash register total or have Mrs. Brazile compare her deposit slip each day with that total. However, negligence is not fraud. Fraud requires a showing of knowingly understating taxable income with intent to evade tax. The negligence shown in this case is not a showing *707 of any knowing understatement of income by petitioners. Thee is no pattern of concealment of funds in this case. Considering the evidence as a whole, we conclude that respondent has failed to show by clear and convincing evidence that petitioners' return for any one of the years 1970, 1971 or 1972 was false or fraudulent with intent to evade tax. Therefore, the assessment or collection of any deficiency for any of the years here in issue is barred. Decision will be entered for the petitioners.
Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue. ↩
2. At the trial, respondent conceded that the deficiencies as determined in the notice of deficiency were overstated to some extent and that the proper deficiencies should be $19,009.05, $271.36 and $36,752.65 for the calendar years 1970, 1971 and 1972, and the additions to tax under sec. 6653(b) should be 50 percent of the amount of these redetermined deficiencies. ↩
3. Respondent concedes that absent a showing in accordance with the provisions of section 6501(c), that petitioners' return for each of the years 1970, 1971 and 1972 was false or fraudulent with intent to evade tax, the assessment or collection of any deficiency is barred since the notice of deficiency was mailed after the expiration of the statute of limitations for determining deficiencies provided for in section 6501(a).↩
4. The parties stipulated into the record in this case the exhibits received at the criminal trial consisting, to a large extent, of canceled checks, summaries, invoices, contracts for sale of beef halves and the like, and also stipulated into this record the complete transcript of the criminal trial.↩